UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CARL YOUNGBLOOD,               §
                               §
        Plaintiff,             §
                               §
v.                             §        NO. 3:05-CV-1680-K
                               §
JO ANNE B.  BARNHART,          §
Commissioner of Social Security, §
                               §
        Defendant.             §


FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b) and an order of the District Court in

implementation thereof, the subject cause has previously been referred to the United States

Magistrate Judge.  The findings, conclusions, and recommendations of the Magistrate Judge, as

evidenced by his signature thereto, are as follows:

Procedural History:  On March 2, 1999, Plaintiff filed his application for a period of disability

and disability benefits alleging disability due to a broken leg, broken ankle, broken jaw,

damaged ribs, an injured right rotator cuff, headaches, upper and lower back injuries and neck

pain.  (Administrative Record 482-90, 492 [Hereinafter Tr.].)

The Administrative Law Judge ("ALJ") conducted a hearing on July 18, 2000.  (Tr.  41-

96.)  However, the ALJ passed away before submitting a decision on Plaintiff's claim for

disability.  (Tr.  182.)  Therefore, a second hearing was conducted on January 12, 2001.  (Tr.  97-

136.)  On June 25, 2001, the ALJ denied Plaintiff's request for disability insurance benefits,

finding that he was not disabled and that he retained the capacity to return to his past relevant

work.  (Tr.  206-213.)  Mr.  Youngblood timely requested a review of the ALJ's decision by the

Appeals Council, and on August 15, 2002, the Appeals Council granted his request because the

ALJ erroneously determined Plaintiff's date last insured.  (Tr.  27, 220-222.)

     Thereafter, a third hearing was conducted on February 20, 2003.  (Tr.  137-181.)  On

March 25, 2003, the ALJ denied Plaintiff's request for disability insurance benefits, finding that

his impairments did not prevent him from returning to his past relevant work as a personnel

scheduler.[1]  (Tr.  32.)  Mr.  Youngblood timely requested a review of the ALJ's decision by the

Appeals Council, and on July 1, 2005, the Appeals Council denied his request.  (Tr.  9-11.)

Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial

review.  *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

     Plaintiff filed his federal complaint on August 22, 2005.  Defendant filed her answer on

November 8, 2005.  On February 22, 2006, Plaintiff filed his brief and on March 21, 2006,

Defendant filed her brief.  Plaintiff filed a reply brief on April 5, 2006.

Standard of Review–Social Security Claims:  When reviewing an ALJ's decision to deny

benefits, the scope of judicial review is limited to a determination of whether: (1) the ALJ's

decision is supported by substantial evidence and (2) the proper legal standard was applied.

*Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (citing *Villa v. Sullivan*, 895 F.2d 1019,

1021 (5th Cir. 1990)).  "Substantial evidence is more than a scintilla, less than a preponderance,

and is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5thCir.

---

[1]  Mr.  Youngblood did not do shoe repairs, (Tr.  124), but he was the operations manager at a
dry cleaning establishment from August 1991 to August 1993, (Tr.  493).

1983)). In determining whether substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment. *Id.* at 1022 (quoting *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988)). Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971)).

Discussion: To prevail on a claim for disability insurance benefits, a claimant bears the burden of establishing that he or she is disabled, which is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 404.1505. Substantial gainful activity is defined as "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit." § 404.1510. Where a claimant applies for benefits, the claimant must prove the existence of a disabling impairment between the claimant's alleged onset date and the date last insured. *See Moss v. Apfel*, No. 98-20215, 1999 WL 130146, at *1 (5th Cir. Feb. 12, 1999) (citing § 404.320(b)(2)).

The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled. *See* § 404.1520. Under the first four steps, a claimant has the burden of proving that his disability prevents her from performing her past relevant work, but under the fifth step, the burden shifts to the Commissioner to prove that there is other substantial gainful activity that the claimant can perform. *See*, *e.g.*, *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

3

In this case, the ALJ proceeded to step four and determined that Mr.  Youngblood was not disabled because he retained the capacity to perform his past relevant work.  (Tr.  27-32.)  He therefore denied Plaintiff's request for disability insurance benefits.  (Tr.  32.)

The documents contained in the administrative record reflect the following chronology of medical care:

On August 3, 1998, Plaintiff was brought to the Hillcrest Baptist Medical Center in Waco, Texas after suffering a broken jaw, a broken left leg and other extensive injuries in a car accident.  (Tr.  693.)  He underwent emergency surgery, which included the placement of a rod in his left leg.  (Tr.  693.)  He was discharged from the hospital one week later and given a prescription for Lorcet.  (Tr.  693.)

**Treatment for Leg, Ankle, Shoulder and Back Injuries**

Plaintiff saw Dr.  Ronnie Shade, an orthopedic surgeon on August 19, 1998.  (Tr.  588.)  Mr.  Youngblood informed Dr.  Shade that he injured his right shoulder, neck, left leg and lower back in the car accident.  (Tr.  588.)  Specifically, Plaintiff stated that he suffered pain in his right shoulder when he lifted his arm and had generalized posterior neck pain which he rated a 4-8 on a pain scale of 1-10.  (Tr.  588.)  He also stated that he suffered lower back pain and spasms, stiffness in his ankle, rib tenderness and bilateral knee pain.  (Tr.  588.)  Upon physical examination of his back, Dr.  Shade noted that his patellar and Achilles reflexes were 2+, the Straight Leg raises were negative, the McBride sitting test was negative and there were motor deficits over extensor hallucis longus and tibialis anterior on the left.  (Tr.  589.)  Regarding Plaintiff's neck, Dr.  Shade found no focal motor or sensory deficits, the Tinsel's test was negative, and there was posterior cervical tenderness and spasms.  (Tr. 589.)  On examination of

4

the right shoulder and rib, he noted subacromial tenderness and a mildly decreased range of motion in the shoulder and tenderness in the right rib cage.  (Tr.  589.)  Radiographs were within normal limits for Plaintiff's right shoulder, right knee and tibiae.  (Tr.  590.)  A radiograph of Plaintiff's spine revealed loss of normal alignment, a decrease of disc height in the C6-C7 segment, and mild spondylitis in the cervical spine and mild anterior compression of the T12- L1 disc in his lumbar spine.  (Tr.  590.)  Dr.  Shade prescribed 7.5 mg of Lortab, Bacitracin ointment, a short leg cast brace, and home health care with twice daily home physical therapy.  (Tr.  591.)  He also determined that Plaintiff was not able to return to work.  (Tr.  591.)

At various times during his treatment, Plaintiff complained to Dr. Shade of pain and stiffness in his left ankle and knee, (Tr. 586, 592, 594-95, 871-73, 896), swelling in his left leg after prolonged standing and walking, (Tr.  586, 592, 594-95, 601, 872-73), a popping sensation in his right shoulder and difficulty sleeping on the right shoulder, (Tr. 586, 592, 872), and back pain and stiffness that worsened in the morning and when he sat for prolonged periods, (Tr.  592, 594-95, 871).

By September 8, 1999, Mr.  Youngblood reported experiencing shoulder pain only upon extreme elevation and rotation and stated that his lower back pain was slowly continuing to improve.  (Tr.  898.)  He continued to complain of pain and swelling in his leg upon prolonged standing and walking until November 17, 1999, which, according to the medical records, is the last time he was seen by Dr.  Shade. (Tr.  896.)

Plaintiff saw Dr.  Ellis, a doctor of osteopathy, for a second opinion on July 7, 1999.  (Tr.  551-52.)  Dr.  Ellis opined that Plaintiff had impingement of the right shoulder and a possible rotator cuff tear.  (Tr. 551.)  He recommended that the rod placed in Plaintiff's left leg be

removed in six months and that an MRI be taken of Plaintiff's shoulder. (Tr. 552.) On July 14, 1999, Plaintiff had an MRI of his shoulder which revealed a mild to moderate degenerative signal in the anterior to mid supraspinatus tendon, mild acromioclavicular capsular hypertrophy and some osteophyte formation. (Tr. 547-48.) Plaintiff was seen again by Dr. Ellis for another second opinion on July 17, 2000. (Tr. 290.) He reported generalized pain in his left leg and left knee pain when walking up steps and squatting. (Tr. 290.) Dr. Ellis recommended an arthrogram and bone scan to determine if Plaintiff was suffering from a torn meniscus and an infected tibia. (Tr. 290-91.) Mr. Youngblood had an arthrogram on July 28, 2000, which revealed a possible incomplete tear of the lateral meniscus. (Tr. 254-55.) A bone scan completed on August 14, 2000, did not show any osteomyelitis and an MRI completed on September 11, 2000, was unremarkable. (Tr. 249-53.)

Plaintiff saw Dr. Ellis for follow-up appointments on September 29, 2000, April 18, 2001, February 27, 2002, and March 27, 2002. (Tr. 263-266.) Plaintiff complained of increasing pain in his left knee. (Tr. 264, 266.) Thereafter, he had another MRI which revealed a torn medial meniscus. (Tr. 263.) Plaintiff had surgery to repair the torn meniscus on April 9, 2002. (Tr. 278-83.) On May 15, 2002, Plaintiff saw Dr. Ellis for a follow-up visit. (Tr. 262.) He reported minimal tenderness in his left knee and had a full range of motion. (Tr. 262.) Dr. Ellis recommended that he stay off work for two more weeks before returning to light duty work. (Tr. 262.) On November 27, 2002, Plaintiff returned to Dr. Ellis complaining of pain in the tibia area and occasional mild knee pain. (Tr. 288.) Dr. Ellis recommended surgery to remove the metal rod from Plaintiff's leg. (Tr. 288.)

**Treatment for Jaw Injuries**

Plaintiff saw oral surgeons Dr. Dennis Youngblood and Dr. Robert Henderson and prosthodontist Charles Patterson for reconstructive jaw surgery and the replacement of eleven teeth. (Tr. 572-73, 583-85, 887-93, 904-11, 944-53.) Over the course of two years, Plaintiff had surgery to implant bone, skin and teeth in an attempt to return his masticatory system to its pre-accident state. (Tr. 583-85, 887-93, 904-11, 944-53.) As of May 5, 2000–the date of the last dental notes in the record–Dr. Henderson reported that he did not anticipate any other major oral surgical procedures for Mr. Youngblood after he underwent additional surgery to replace two dental implants and reconstruct lost teeth. (Tr. 947-48.)

**Chiropractic Care**

Plaintiff received chiropractic care from Drs. John Freeman and Scott White. (Tr. 302-450, 549-550, 576-77, 607-672, 787-88, 800-42, 912-15, 918, 926-30, 935-42.)[2] Both also coordinated his work hardening treatments and group therapy and referred him for consultations with other physicians. At his initial visit on August 24, 1998, he complained of severe pain and numbness in his back, neck and arms. (Tr. 607.) On a pain scale from 1-10, he ranked his pain at 10. (Tr. 607.) Dr. Freeman diagnosed Plaintiff with radicular syndrome to both lower legs and arms, a dislocated shoulder, neuritis, lumbar and cervical plexus disorders and myospasms. (Tr. 609.) He directed that Plaintiff receive electrical muscle stimulation and cryotherapy five times per week for two weeks, with the therapy to continue thereafter at a rate of three times per week. (Tr. 609.) He also placed Plaintiff in a lumbosacral support. (Tr. 609.) By January 15, 1999, Plaintiff rated his pain as a 4 on a scale of 1-10 but continued to complain of pain in his

---

[2] Although these portions of the administrative record are from Plaintiff's files from these chiropractic practitioners, not all were generated by them.

chin, neck, left shoulder, lower back, and left knee and ankle.  (Tr. 787.)  Six months later, on

July 15, 1999, Plaintiff was complaining of headaches, knee and ankle pain, and numbness and

sensitivity in his lip and jaw.  (Tr. 935.)  Plaintiff saw Dr. White on November 29, 1999, and

complained of back pain and swelling in his left lower leg.  (Tr. 914.)

When Dr. White examined Mr. Youngblood on October 19, 2000, he determined that Plaintiff

had severe restricted ranges of motion in all areas of injury.  (Tr. 319.)  He opined that

Plaintiff's clinical condition was stabilized and that he was not likely to improve with surgical

intervention or active medical treatment.  (Tr. 319.) [3]

Plaintiff saw Dr. Manuel Banta, an anesthesiologist specializing in pain control on

February 21, 2002.  (Tr. 355-56.)  On a scale of 1 to 10, Plaintiff rated his face pain a 4, his right

shoulder pain a 7, his upper back pain a 5 and his middle back pain a 6.  (Tr. 355.)  The doctor

prescribed Celebrex, Elavil and Ultram.  (Tr. 354.)  Plaintiff returned to Dr. Banta on

November 7, 2002.  (Tr. 424.)  He complained of lower back pain and swelling in his left leg.

(Tr. 424.)  Dr. Banta noted that Plaintiff's main problems were jaw and left leg pain but that his

knee examination was satisfactory.  (Tr. 424.)  He prescribed Celebrex and Elavil.  (Tr. 424.)

**Functional Capacity Assessments**

Plaintiff's functional capacity was evaluated numerous times over the course of his

treatment.  On January 12, 1999, Bobby Dela Rosa, L.P.T performed an evaluation and

---

[3]  Dr. White submitted a letter on Mr. Youngblood's behalf to the Office of Hearings and Appeals wherein he stated his belief that Plaintiff became disabled on the day of his accident and continued to be disabled.  (Tr. 258.)  He described how Plaintiff's injuries reduced his ability to engage in work-related activities such as talking, sitting, walking, standing and lifting.  (Tr. 258.)  He also asserted that Plaintiff suffered "constant headaches" and suffered pain "in a multitude of positions."  (Tr. 258.)  Additionally, he disputed a functional capacity report which stated that Plaintiff retained the capacity to help with lifting and loading vans, stating that Plaintiff did not have the capacity to participate in such activities on a daily basis.  (Tr. 259.)

concluded that Mr.  Youngblood had the capacity to work at the light-medium level with a maximum lifting capacity of 40 pounds.  (Tr.  789-99.)  On May 26, 1999, Kelli Duncan, L.P.T. reported that he met all requirements at the light level.  (Tr.  559-61.)  On June 26, 2000, Plaintiff was evaluated by Rhonda Tanksley, L.P.T. who concluded that he satisfied all the requirements of light-medium work.  (Tr.  304-07.)  He was seen again by Ms.  Tanksley on October 12, 2000, at which time she again found him capable of engaging in light-medium work. (Tr.  311-14.)  On October 17, 2001, Ms.  Tanksley again evaluated his functional capacity, finding him able to perform light-medium work.  (Tr.  339-42.)  In her final evaluation of Mr. Youngblood on June 19, 2002, she found that certain limitations precluded him from meeting all requirements in the light work category.  (Tr.  401-04.)

During the same period of time Plaintiff's medical condition was evaluated on multiple occasions by Dr.  Jack Kern, M.D., an orthopedic surgeon.  On February 16, 1999, Plaintiff complained of left ankle and knee pain and stiffness, problems with his gait, shoulder pain, lower back pain and dental problems.  (Tr.  578-79.)  Dr.  Kern reported that Plaintiff was able to walk in a hallway with a reasonable gait pattern, had a decreased range of motion in his back and ankle, lacked full passive extension in his left knee, had some swelling in his leg and foot, and had shoulder discomfort when raising and rotating his shoulder.  (Tr.  579-80.)  He did not find any radiculopathy of either the upper or lower extremities.  (Tr.  579.)  Dr.  Kern determined that Plaintiff was not at maximum medical improvement and would need approximately six months of rehabilitation before an impairment rating could be performed.  (Tr.  580.)  He opined that Plaintiff would not likely need further surgeries except to remove the rod in his leg and to improve his shoulder.  (Tr.  580.)

Dr. Kern reevaluated Plaintiff on October 26, 1999. (Tr. 931.) Plaintiff's major complaints were stiffness of his ankle and loss of movement in his knee. (Tr. 932.) Dr. Kern determined that Plaintiff had reached maximum medical improvement and could return to work as a courier. (Tr. 933.) He rated Plaintiff's whole person impairment at 7%. (Tr. 933.)

Plaintiff saw Dr. Kern, for a final evaluation on October 29, 2002. (Tr. 429.) Dr. Kern reported that Plaintiff was able to walk with full weight-bearing, and his only complaint was some leg swelling at the end of the day. (Tr. 428.) He noted that Plaintiff's main problem was residual alignment and malocclusion of his jaw. (Tr. 428.) Plaintiff stated that he "considers himself improved" after his 2002 surgery to repair his meniscus. (Tr. 428.) Dr. Kern determined that Plaintiff was able to return to work as a truck driver. (Tr. 426.)

**Testimony at the Three Administrative Hearings**

**Plaintiff's Testimony**

Plaintiff testified on his own behalf at all three administrative hearings. At the first hearing on July 18, 2000, he stated that he continued to experience complications related to his original injuries. (Tr. 60.) He first described swelling in his knee and ankle and testified that he did not experience swelling while sitting, but experienced pain and swelling if he was "active" or if he stood for more than one hour. (Tr. 60-62.) He said that he used his cane to try to relieve pressure in his leg, and if unsuccessful, would lie down for one hour. (Tr. 62.) He also testified that he experienced lower back pain and could not drive for long distances or sit for extended periods without needing to lay down. (Tr. 63-65.) Regarding his jaw injury, he stated that he experienced an increase of pain during bad weather. (Tr. 71.) He testified that there was no time during his waking hours when he was completely without pain and took hydrocodone four

times per day in an attempt to relieve the pain.  (Tr.  62-63, 71.)  When asked by the ALJ to

describe his lifting abilities, he said he retained the ability to lift 20 pounds.  (Tr.  75.)

At the second administrative hearing on January 12, 2001, Plaintiff stated that continued

to suffer pain and stiffness in his knee, back, ankle and jaw.  (Tr.  105-06.)  He stated that he no

longer was taking hydrocodone, but was taking Vioxx and Advil.  (Tr.  110.)  Additionally,

Plaintiff's attorney asked him whether he felt that he would be able to return to work as a courier

or a supervisor, and he responded that he did not believe he would be able to because he could

not walk fast enough or walk with weight.  (Tr.  117-18.)  He stated that he might be able to

return to his previous work at a dry cleaners if he wasn't required to unload vans and was

permitted to rest.  (Tr.  119.)

Mr. Youngblood testified at the third hearing that he suffered constant leg and knee

problems since the time of his accident and had used walking aids since that time.  (Tr.  165-66.)

He also indicated that he continued to experience pain in his jaw, back, knee, ankle and shoulder.

(Tr.  167-68.)  He testified that he took Advil or Aleve for his pain, and only relied on

hydrocodone after his surgeries.  (Tr.  168.)

**Testimony of the Medical Experts**

Dr.  Sterling Moore testified as the medical expert at the first administrative hearing on

July 18, 2000.  (Tr.  82.)  Based on a review of Mr. Youngblood's medical file, Dr. Moore stated

that Plaintiff clearly was experiencing some residual pain in his leg but was able to ambulate,

had increasing range of motion in his shoulder but was not able to lift his arm all of the way

above his head,  was experiencing a slight  improvement in range of motion in his back and was

still undergoing surgeries for dental implants (Tr.  83-84.)  He also opined that Plaintiff's obesity

could be aggravating his pain in his back and legs.  (Tr.  84.)  He determined that Plaintiff could

lift at the light level, with occasional stooping, crouching, kneeling and bending and could walk

for two to four hours per day.  (Tr.  85.)  He indicated no limitations in sitting or talking.  (Tr.

88.)

Dr.  Charles Murphy testified as the medical expert at both the second and the third

administrative hearings.  (Tr.  120, 147).  At both hearings he concluded that Mr. Youngblood

did not meet or equal any of the Listings.  (Tr.  122, 148.)

At the second hearing he stated that he agreed with Plaintiff's most recent functional

capacity evaluation on October 12, 2000, wherein it was determined that Plaintiff had the

capacity to perform a limited range of light work, with occasional bending and no squatting,

kneeling or climbing.  (Tr.  122-23.)  He noted that Plaintiff would additionally need to be

permitted to change position periodically.  (Tr.  123.)  At the third hearing on February 20, 2003,

he opined that Plaintiff had the ability to engage in substantial gainful activity in the restricted

light range.  (Tr. 155.)  He stated that Mr. Youngblood could frequently lift ten pounds,

occasionally lift twenty pounds, and could stand or walk six hours out of an eight-hour workday

with a sit-stand option.  (Tr. 153-54.)  Additionally, he stated that Plaintiff would be limited to

occasional bending, kneeling and squatting and would not be able to crawl or climb.  (Tr.  154.)

**Testimony of the Vocational Experts**

Ms.  Joyce Shoop testified as the vocational expert at the first hearing.  (Tr.  89.)  She

classified the exertional levels of Plaintiff's past relevant work as all being in either the medium

or light exertional level, with the exception of his past employment as a finisher, which she

classified as performed at the heavy exertional level.  (Tr. 90-91.)  The ALJ posed a hypothetical

question to Ms. Bloom in which he asked her classify the type of work a person could do if they

had the following limitations: could only walk two to four hours in a workday; could

occasionally squat, stoop, crawl and bend over; could lift at the light level; and had overhead

lifting limitations. (Tr. 91-92.) Ms. Bloom responded that such a person could perform

sedentary work. (Tr. 92.) The ALJ next asked Ms. Bloom to describe work that would be

available in the national economy for a person with the aforementioned limitations and added

that such a person would also need to change postural positions throughout the day. (Tr. 92.)

She responded that such an individual could work as a cashier, dispatcher, security badge

checker, security system monitor, gate guard and possibly an escort car driver. (Tr. 93-94.)

When Plaintiff's counsel questioned Ms. Shoop regarding whether a person could find any job

in the national economy if he required the opportunity to lie down up to four times per day for a

half an hour each time, she responded that no work would be available. (Tr. 94.) Plaintiff's

counsel also asked Ms. Shoop whether a person with the limitations listed by the ALJ would be

able to work if his concentration was impaired due to pain medications. (Tr. 94.) She

responded that such a person might be able to work if his concentration was fair to good. (Tr.

94.)

Jerry Hildre testified as the vocational expert at the second hearing. (Tr. 123.) He

testified that Plaintiff would not be able to return to his former job as a delivery route driver or as

a transmission rebuilder, but that there were other jobs in the economy which he could perform.

(Tr. 125-26.) Plaintiff's attorney asked Mr. Hildre whether a person would be able to perform

the aforementioned jobs if they needed to lie down "every now and then" for an hour. (Tr. 127.)

Mr. Hildre responded that such a person would not be able to perform such jobs. (Tr. 127.)

Tammie Donaldson testified as the vocational expert at the third and final administrative hearing. (Tr. 169.) The ALJ asked the following question:

> [A]ssume first that we have an individual closely approaching advanced age with a high school plus education, the prior work experience of the claimant with a restricted light RFC. Sitting, standing and walking six out of eight hours, but with a sit/stand option. Lifting 20 pounds occasionally and less than 10 frequently. No crawling or climbing. Occasional posturals. Stair climbing no more than one floor at a time. Would such an individual be able to return to any of the past relevant work of claimant?" (Tr. 171.)

Ms. Donaldson opined that Plaintiff would be able to return to work as a shoe repairer helper and might be able to return to some of his supervisory positions. (Tr. 172-74.) Additionally, she stated that Plaintiff had the capacity and qualifications to work as a storage facility rental clerk and an office worker. (Tr. 173.)

**Plaintiff's Arguments**

Plaintiff first argues that the ALJ failed to comply with Social Security Ruling 96-7p when he determined that Plaintiff's complaints of pain were not credible. Under SSR 96-7p, an ALJ who discounts a claimant's allegations of disabling pain must discuss seven factors set forth therein. The seven factors are:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.
> SSR 96-7p, 1996 WL 374186, at *3 (S.S.R. 1996).

In this case, the ALJ addressed all of the applicable factors.  In the second paragraph of the fourth page of his opinion, he discussed factors 1, 2 and 4.  (Tr. 30.)  Initially, he referenced Mr. Youngblood's contention that he experiences back, neck, shoulder, and knee pain with episodes of weakness in the lower extremities.  (Tr. 30.)  Thereafter, he cited to the medical evidence regarding Plaintiff's prescription medications and noted the lack of any evidence in the record that Plaintiff experienced side effects that could affect his capacity to work.  (Tr. 30.)  He addressed Plaintiff's testimony that his daily and functional activities are limited and declined to accept such testimony due to evidence in the record that he had the capacity to perform light work.  (Tr. 30)  Additionally, at an earlier point in his opinion, the ALJ noted that Plaintiff complained in 1999 that standing and walking aggravated his ongoing leg pain and cited the medical expert's opinion testimony that Plaintiff had the ability to sit or stand for six hours in an eight hour work day, with a sit/stand option, occasional postural limitations, and no crawling or climbing.  (Tr. 29.)

Furthermore, a review of the entire record reveals that the ALJ's adverse credibility determination regarding Plaintiff's reported level of pain is supported by substantial evidence.  While Plaintiff testified at the 2001 administrative hearing that he had continual problems with his knee, back, ankle, jaw and shoulder since the date of his original injury, (Tr. 105), including "constant pain" in his knee, (Tr. 109), the medical evidence demonstrates that his pain and symptoms improved markedly after physical therapy, surgery and chiropractic care.  For instance, when Plaintiff initially began treatment with Dr. Slade, he reported suffering shoulder pain in his right shoulder when lifting his arm as well as lower back pain and spasms.  (Tr. 588).  However, one year later, he told Dr. Slade that his shoulder pain occurred only upon extreme

elevation and rotation and denied significant lower back pain when sitting.  (Tr.  898-99.)

Likewise, when Plaintiff first saw chiropractor John Freeman shortly after his accident, he

complained of severe pain and numbness in his back, neck and arms and ranked his pain as 10 on

pain scale of 1-10.  (Tr.  607.)  By January 15, 1999, Plaintiff was experiencing significantly less

pain, as he rated his pain as only a 4 on a scale of 1-10.  (Tr. 787.)  Plaintiff also testified that he

stopped relying on hydrocodone to manage his pain in August of 2000.  (Tr.  110.)  Finally,

when Plaintiff saw

Dr.  Manuel Banta, on February 21, 2002, he rated his face pain at 4, his right shoulder at 7, his

upper back at 5 and his middle back at 6.  (Tr.  355.)  When he returned to Dr.  Banta on

November 7, 2002, he complained of lower back pain, but  knee and neurological examinations

were satisfactory .  (Tr.  424.)

Plaintiff also argues that the ALJ improperly gave "great weight" to the testimony of Dr.

Charles Murphy, M.D. regarding Plaintiff's capacity to engage in substantial gainful activity and

failed to give controlling weight to the opinions of Dr.  Kevin White, plaintiff's treating

chiropractic doctor and Rhonda Tanksley, a licensed physical therapist, citing Tr.  414-19.

Under the regulations, the medical opinion of a "treating source" regarding the nature and

severity of a claimant's impairment should be given controlling weight if the opinion is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and not

inconsistent with the other substantial evidence in the record.  *See*  § 404.1527(a)(2), (d)(2).

However, neither chiropractors nor licensed physical therapists are defined as acceptable medical

sources under § 404.1513(a) and (d) and therefore their opinions do not constitute "medical

opinions."  In fact, Mr.  Youngblood's counsel conceded as much at the third administrative

16

hearing.  (Tr.  144.)  Rather, the opinions of such persons fall within the provisions of §

404.1513(e) defining "other sources."  *See Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995);

*Walters v. Comm'r of Soc. Sec.*,127 F.3d 525, 530-31 (6th Cir. 1997); *see also Griego v.*

*Sullivan*, 940 F.2d 942, 945 (5th Cir.  1991); *Castillo v.  Barnhart*, 151 Fed.  Appx.  334 (5th

Cir.  2005).  Therefore, it was well within the ALJ's prerogative to afford greater weight to the

opinion of the medical expert Dr.  Murphy.  (Tr.  193-97.)

Moreover, the ALJ's decision to give great weight to Dr.  Murphy's opinion regarding

Plaintiff's residual functional capacity ("RFC") is supported by the objective medical evidence

in the record.  *See* § 404.1527(f).  When he testified in 2003, Dr.  Murphy opined that Plaintiff

had the capacity perform a restricted range of light work.  (Tr.  153-54.)  This RFC finding is

actually more favorable to Plaintiff than the 1999 and 2002 findings of orthopedic surgeon Dr.

Jack Kern, who opined that Plaintiff could return to his previous work as a courier. (Tr.  426,

933.)  Further, Dr.  Murphy's opinion is wholly consistent with the conclusions of the licensed

physical therapists' reports from January 1999 through October 2001.  Although Ms.  Tanksley's

final evaluation in June 2002 is qualified, the limitations are not wholly inconsistent with the

finding of the ALJ that Plaintiff was capable of working as a personell scheduler.  Further, this

evaluation occurred shortly after Plaintiff underwent arthroscopic knee surgery.  (Tr.  281-83,

401.)  Indeed, Plaintiff later told Dr.  Kern that he "considers himself improved" after his April

2002 surgery.  (Tr.  428.)  Therefore, the ALJ did not err by affording Dr.  Murphy's opinion

great weight.

**RECOMMENDATION:**

For the forgoing reasons, it is recommended that the District Court enter its order AFFIRMING the Commissioner's decision and that a judgment be entered DISMISSING Plaintiff's complaint with prejudice.  A copy of this recommendation shall be transmitted to counsel for the parties.

Signed this 25th day of October, 2006.

Wm. F. Sanderson Jr.
United States Magistrate Judge

<u>NOTICE</u>

In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten (10) days after being served with a copy of this recommendation.  Pursuant to *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996)(*en banc*), a party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten (10) day period may bar a *de novo* determination by the district judge of any finding of fact and conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the district court.